IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| INTEL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 6:06-CV-551 (LED) |
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | Judge:        Hon. Leonard Davis |
| ORGANISATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Counterdefendant. | ) | |
| | ) | |
| | ) | |

**INTEL'S SECOND AMENDED ANSWER TO
CSIRO'S FIRST AMENDED COUNTERCLAIM**

Plaintiff and Counter-defendant Intel Corp. ("Intel") answers Defendant and Counterclaimant Commonwealth Scientific and Industrial Research Organisation's ("CSIRO") counterclaim as follows:

## II.  CSIRO'S COUNTERCLAIM

### PARTIES

24.     On information and belief, Intel admits that CSIRO has a principal place of business at Limestone Avenue, Campbell ACT 2612, Australia.  Except as specifically admitted, Intel lacks

sufficient information to form a belief about the remaining allegations in Paragraph 24 and on that basis denies each and every remaining allegation.

25.     Intel admits the allegations of Paragraph 25.

26.     Intel admits the allegations of Paragraph 26.

## JURISDICTION AND VENUE

27.     Intel admits that jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338(a), and that venue is proper in the Eastern District of Texas, and that Intel has done business in this district. Except as specifically admitted, Intel denies each and every allegation of Paragraph 27.

## FIRST COUNTERCLAIM

28.     Intel admits that U.S. Patent No. 5,487,069 ("the '069 patent") entitled, "Wireless LAN" issued on January 23, 1996.  Intel denies that the '069 patent was duly and legally issued. Except as specifically admitted, Intel lacks sufficient information to form a belief about the remaining allegations in Paragraph 28 and on that basis denies each and every remaining allegation.

29.     Intel denies each and every allegation of Paragraph 29.

30.     Intel denies each and every allegation of Paragraph 30.

31.     Intel denies each and every allegation of Paragraph 31.

32.     Intel denies each and every allegation of Paragraph 32.

33.     Intel denies each and every allegation of Paragraph 33.

34.     Based on the foregoing, CSIRO is not entitled to any relief.

## AFFIRMATIVE DEFENSES TO COUNTERCLAIM

## FIRST AFFIRMATIVE DEFENSE – NON-INFRINGEMENT

35.     Intel does not infringe and has not infringed, either directly, indirectly or otherwise, any valid claim of the '069 patent.

## SECOND AFFIRMATIVE DEFENSE – INVALIDITY

36.     The '069 patent is invalid for failing to meet one or more of the requirements for patentability, including 35 U.S.C. §§ 102, 103 and 112.

## THIRD AFFIRMATIVE DEFENSE – ESTOPPEL

37.     CSIRO is estopped from alleging that wireless LAN components compliant with the a, g, or draft n amendments to the IEEE 802.11 standard infringe any claims of the '069 patent, based on, but not limited to, statements made and actions taken before the U.S. Patent and Trademark Office by the '069 applicants and their attorneys to obtain issuance of the '069 patent.

38.     Further, CSIRO is estopped from seeking damages in this case exceeding the rate for which it has licensed the '069 patent to several other companies because of CSIRO's commitments to the Institute of Electrical and Electronics Engineers (IEEE) to license the patent on reasonable and non-discriminatory terms during the IEEE's consideration of the wireless standard at issue.

39.     On October 26, 1998, Vic Hayes, Chair of the IEEE P802.11 group, sent CSIRO a letter requesting that, if CSIRO contended that the '069 patent was needed to implement the 802.11a amendment, CSIRO give its assurance that it would offer a license on reasonable and nondiscriminatory ("RAND") terms and conditions to all applicants.

40.     CSIRO sent the IEEE such a letter of assurance ("LOA") on December 4, 1998, confirming CSIRO's position that the '069 patent may be needed to implement 802.11a and

committing that it would grant a nonexclusive license on a "non discriminatory basis and on reasonable terms and conditions including its then-current royalty rates."

41.     CSIRO then confirmed to members of the IEEE and others that its LOA applied to other amendments of the 802.11 standard.

42.     CSIRO's assurances and promises are expressly irrevocable.

43.     CSIRO's actions caused the IEEE and its members/participants (including companies with respect to which CSIRO is now alleging claims of infringement under the '069 patent) to reasonably rely upon the representation by CSIRO that it (like other IEEE participants) would license on RAND terms.  In reliance on the IEEE process, these IEEE members and participants have invested substantial resources in product research, design, manufacturing, sales, marketing and customer support.  On information and belief, had the IEEE members and participants known that CSIRO would demand a royalty rate in the range it now seeks from defendants in this action, the IEEE members and participants would have rejected 802.11a in its current form, and instead would have adopted a different amendment to 802.11.

44.     CSIRO has licensed the '069 patent on several occasions.  On each of those occasions, the licenses required the respective licensee to pay an amount equal to a small fraction of the total cost of the wireless chipset allegedly practicing the '069 patent.  The license rate obtained by CSIRO on these licenses is consistent with the value of the patent as assessed by CSIRO's own financial consultants, hired to value the '069 patent.

45.     After granting several licenses on such terms, CSIRO has flatly refused to license the '069 Patent on comparable or RAND terms to any other party except at rates representing a several thousand percent increase over rates paid on volume sales under the original licenses granted.

46.     Indeed, the rates now demanded by CSIRO in effect would equate to nearly a 100% royalty on wireless chips compliant with the relevant 802.11 amendments.

47.     Further, CSIRO's current royalty demands are not only wildly inconsistent with its historical licensing practices, and its own independent consultant's report, but also **(1)** far exceed the royalty rates offered by other patentees who claim to own other essential 802.11 patents**, (2)** do not account for royalty stacking in the 802.11 standard, **(3)** are divorced from the economic realities of the wireless LAN industry, **(4)** discriminate in favor of current licensees, and **(5)** are unsupported by any legal test.

48.     IEEE participants, including Intel and Intel's customers, are and have been materially prejudiced by CSIRO in refusing to license at RAND rates.

49.     CSIRO should be estopped from seeking damages that would be anything more than the RAND terms to which it committed in the IEEE proceedings.

## FOURTH AFFIRMATIVE DEFENSE – PATENT MISUSE

50.     The '069 patent is unenforceable for patent misuse, based on, but not limited to, CSIRO's continuing unlawful attempts to enforce the '069 patent, which CSIRO knows or should know is invalid, unenforceable and/or not infringed.

## FIFTH AFFIRMATIVE DEFENSE – EQUITABLE ESTOPPEL

51.     Intel realleges and incorporates by reference Paragraphs 38 through 49 above.

52.     CSIRO's enforcement of the '069 patent is barred in its entirety by the doctrine of equitable estoppel, based on, but not limited to, CSIRO's failure to license the '069 patent on reasonable and non-discriminatory terms, despite prior assurances to the Institute of Electrical and Electronics Engineers (IEEE) during consideration of the wireless standards at issue.

## SIXTH AFFIRMATIVE DEFENSE – UNCLEAN HANDS

53.     Intel realleges and incorporates by reference Paragraphs 38 through 49 above.

54.     CSIRO's requested equitable relief on the '069 patent is barred in its entirety by doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE – LACHES

55.     CSIRO's requested relief on the '069 patent is barred or otherwise limited by the doctrine of laches.

## EIGHT AFFIRMATIVE DEFENSE – STATUTE OF LIMITATIONS

56.     CSIRO's requested relief is barred or otherwise limited pursuant to 35 U.S.C. § 286.

## NINTH AFFIRMATIVE DEFENSE – FAILURE TO MARK

57.     CSIRO has failed to comply with the requirements of 35 U.S.C. § 287, based on, but not limited to, its failure to mark products covered by the claims of the '069 patent and/or its licensees' failure to mark products covered by the claims of the '069 patent.

## TENTH AFFIRMATIVE DEFENSE – COSTS

58.     CSIRO's requested relief is barred or otherwise limited pursuant to 35 U.S.C. § 288.

## ELEVENTH AFFIRMATIVE DEFENSE – EXHAUSTION

59.     CSIRO's requested relief is barred or otherwise limited based on exhaustion, the "first sale" doctrine and/or restrictions on double recovery.

## TWELFTH AFFIRMATIVE DEFENSE – INEQUITABLE CONDUCT

60.     Upon information and belief, the '069 patent is unenforceable due to inequitable conduct committed during its prosecution.

61.     On information and belief, the named CSIRO inventors, as described below, and/or others substantively involved in the prosecution of the application leading to the '069 patent were aware of information material to the patentability of the claims of the '069 patent, and they withheld that information from the U.S. Patent and Trademark Office ("USPTO") with the intent to deceive the USPTO.

62.     The withholding of material prior art with the intent to deceive the USPTO is a violation of the duty of disclosure under 37 C.F.R. § 1.56 and constitutes inequitable conduct.

63.     On January 10, 1994, CSIRO filed with the USPTO a declaration signed by all of the named inventors on the '069 patent—including Dr. Terence Percival ("Dr. Percival"), Mr. Graham Daniels ("Mr. Daniels"), and Dr. John O'Sullivan ("Dr. O'Sullivan").

64.     In such declaration, the inventors acknowledged their duty under 37 C.F.R. § 1.56 to disclose to the USPTO all information known to them to be material to patentability.

65.     The duty to disclose was a continuing one, continuing until and through the date of issuance of the '069 Patent.

66.     On February 3, 1995, CSIRO filed with the USPTO an Information Disclosure Statement ("IDS") "in compliance with the duty of disclosure set forth in 37 C.F.R. 1.56."

67.     Upon information and belief, the following are specific items of prior art that CSIRO and the named inventors identified below intentionally withheld from the USPTO.

**The Percival Paper**

68.     While this IDS disclosed certain prior art publications to the USPTO, it did not disclose a publication entitled "Wireless Systems at High Bit Rates – Technical Challenges" ("the Percival paper").

69.     The Percival paper was authored by two of the CSIRO researchers named as inventors in the '069 patent, Dr. Terence Percival and Dr. John O'Sullivan, and Alan Young, a third CSIRO author.

70.     On information and belief, CSIRO published, distributed, and presented the Percival Paper to members of the public on November 12, 1992 at the First International Workshop on Mobile and Personal Communications Systems held at the University of South Australia in Adelaide, Australia.

71.     The Percival paper was a product of the CSIRO wireless LAN research that resulted in the '069 patent.  Every page of the paper bears the words "CSIRO Division of Radiophysics," and the "Acknowledgments" section of the paper states:

> The work presented here is a summary of the barriers and solutions to providing a high-speed WLAN system.  The work is a result of the discussions held over the last twelve months with a large number of colleagues in the CSIRO Institute of Information Science and Engineering and Macquarie University.

72.     Because the Percival paper was published more than one year prior to the actual filing date of the U.S. application leading to the '069 patent (i.e., November 23, 1993) (hereafter "The Application"), it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

73.     The Percival paper discloses all of the elements of several of the issued and originally-filed claims of the '069 patent, and it discloses most, if not all, of the elements of the remaining issued and originally-filed claims.

74.     Furthermore, no reference considered by the USPTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Percival paper discloses.

75.     For at least these reasons, the Percival paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

76.     The Percival paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

77.     At least two of the named inventors, as described above, were aware of the Percival paper at, before, and during the filing of the IDS and the The Application.

78.     At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the USPTO and/or intentionally acted in such a way to ensure that the Percival paper was not disclosed to the USPTO.

79.     At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the USPTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Barry Paper**

80.     The IDS also did not disclose a publication entitled "High-Speed Nondirective Optical Communications for Wireless Networks" ("the Barry paper").

81.     John R. Barry, Joseph M. Kahn, Edward A. Lee, and David G. Messerschmitt authored the Barry Paper.

82.     The Barry paper was known to at least two of the '069 patent inventors, Dr. Terence Percival and Dr. John O'Sullivan, because it was cited in the Percival paper.

83.     The Barry paper disclosed a wireless LAN using multicarrier modulation and was published in the November 1991 issue of IEEE Network Magazine, a printed publication widely disseminated to persons of ordinary skill in the relevant art.

84.     Because the Barry paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

85.     The Barry paper discloses all of the elements of several of the originally-filed claims of the '069 patent, and it discloses most, if not all, of the elements of the remaining issued and originally-filed claims.

86.     Furthermore, no reference considered by the USPTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Barry paper discloses.

87.     For at least these reasons, the Barry paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

88.     The Barry paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

89.     At least two of the named inventors, as described above, were aware of the Barry paper at, before, and during the filing of the IDS and The Application.

90.     At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the USPTO and/or intentionally acted to ensure that the Barry paper was not disclosed to the USPTO.

91.     At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Rault Paper**

92.     The IDS also did not disclose a publication entitled "The Coded Orthogonal Frequency Division Multiplexing (COFDM) Technique, and its Application to Digital Radio

Broadcasting Towards Mobile Receivers" by J.C. Rault, D. Castelain, and B. Le Floch ("the Rault paper"), published, distributed, and presented to members of the public in 1989.

93.     Because the Rault paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

94.     The Rault paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent.

95.     For example, the abstract of such publication states:[1]

> The broadcasting channel towards mobile receivers, especially in a dense urban area, is particularly hostile, which makes the transmission of high bit rate very challenging.
>
> The conjunction of an Orthogonal Frequency Division Multiplexing (OFDM) technique and a convolutional coding scheme (associated to a Viterbi decoding algorithm) is a promising solution (COFDM) studied at CCETT, that is suitable to cope with such a channel.
>
> In the first part of the paper, the theoretical principles of the system are detailed.  The second part concerns the realization of a complete COFDM system, designed within the framework of the DAB (Digital Audio Broadcasting) EUREKA 147 project, which is able to broadcast 5.6Mbit/s in a bandwidth of 7MHz.  For the time being, this rate corresponds to 16 high quality stereophonic programs.  Finally, network aspects are pointed out as far as the introduction of a new radio broadcasting service is concerned.

96.     Furthermore, no reference considered by the USPTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Rault paper discloses.

97.     For at least these reasons, the Rault paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

---

[1] CH2682 – 3/89/0000-0428, © 1989 IEEE, CSI0061454.

98.     The Rault paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

99.     At least one of the named inventors, Dr. Percival, was aware of the Rault paper before the issuance of the '069 patent.

100.     At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the USPTO and/or intentionally acted in such a way to ensure that the Rault paper was not disclosed to the USPTO.

101.     At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Le Floch Paper**

102.     The IDS also did not disclose a publication entitled "Digital Sound Broadcasting to Mobile Receivers" by Bernard Le Floch, Roselyne Halbert-Lassalle, and Damien Castelain ("the Le Floch paper"), published, distributed, and presented to members of the public in 1989.

103.     Because the Le Floch paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

104.     The Le Floch paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent.

105.     The Le Floch paper's "system" is outlined as follows:[2]

> The system described in this article, combining spectrum and power efficiency, is mainly based on the conjunction of the Orthogonal Frequency Division Multiplexing technique (already proposed for HF data transmission in an ionospheric channel or for

---

[2] 0098 3063/89/0200 0493501, © 1989 IEEE, CSI0042438.

transmissions through telephone networks [3] [4]), and a coding
strategy associated with diversity in the frequency domain.

106.    Furthermore, no reference considered by the USPTO examiner during the prosecution
of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the
Le Floch paper discloses.

107.    For at least these reasons, the Le Floch paper is highly material to the patentability of
both the issued and the originally-filed claims of '069 patent.

108.    The Le Floch paper deserved to be considered by the examiner(s) in making decisions
regarding patentability of The Application.

109.    At least one of the named inventors, Dr. Percival, was aware of the Le Floch paper
before the issuance of the '069 Patent.

110.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Le
Floch paper to the USPTO and/or intentionally acted to ensure that the Le Floch paper was not
disclosed to the USPTO.

111.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Le
Floch paper to the USPTO with the intention of misleading the USPTO as the disclosure would have
had a significant and material impact on the patentability of The Application.

**The Bingham Paper**

112.    The IDS also did not disclose a publication entitled "Multicarrier Modulation for
Data Transmission:  An Idea Whose Time Has Come" by John A. C. Bingham ("the Bingham
paper"), published, distributed, and presented to members of the public in 1990.

113.    Because the Bingham paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

114.    The Bingham paper discloses most or all of the elements of the issued and originally-filed claims of the '069 patent.

115.    Furthermore, no reference considered by the USPTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Bingham paper discloses.

116.    For at least these reasons, the Bingham paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

117.    The Bingham paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

118.    At least one of the named inventors, Dr. Percival, was aware of the Bingham paper before the issuance of the '069 Patent.

119.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the USPTO and/or intentionally acted to ensure that the Bingham paper was not disclosed to the USPTO.

120.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**HF Radios and Modems**

121.    The IDS also did not disclose the existence of high-frequency modems and high-frequency radios ("HF radios and modems").

122.   HF radios and modems have been in existence since as early as the 1960's.  Examples of HF radios and modems include an HF radio system called "Piccolo," the KATHRYN system, and marine HF radio.

123.   Because HF radios and modems were offered for sale, sold, made, and used more than one year prior to the actual filing date of The Application, they are prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

124.   HF radios and modems discloses most or all of the elements of the issued and originally-filed claims of the '069 patent.

125.   HF radios and modems were material to The Application and they deserved to be considered by the examiner(s) in making decisions regarding patentability The Application.

126.   At least two of the named inventors, Graham Daniels and John O'Sullivan, were aware of HF radios and modems at, before, and during the filing of the IDS and The Application.

127.   At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the USPTO and/or intentionally acted to ensure that these items were not disclosed to the USPTO.

128.   At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

129.   In sum, each of the above described papers and HF radios and modems discloses most or all of the elements of the issued and originally-filed claims of the '069 patent.  Thus, the named CSIRO inventors, as described above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF

radios and modems would have been important to and carefully considered by the examiner in deciding whether to allow the claims.

130.   Despite the high materiality of the above described papers and HF radios and modems and the written acknowledgment by the inventors and CSIRO of their duty to disclose material prior art, none of this prior art was disclosed to the USPTO during the prosecution.

**Arguments For Patentability**

131.   In response to a prior art rejection the USPTO examiner entered against the originally-filed claims, CSIRO canceled the originally-filed claims and added new claims in an Amendment filed on June 30, 1995.

132.   In arguing for the patentability of the new claims, CSIRO asserted that the prior art cited by the USPTO examiner did not disclose several specific elements of the new claims.

133.   However, all of the specific elements relied upon by CSIRO for its patentability arguments are disclosed in the aforementioned prior art, which was concealed from the USPTO.

134.   Thus, the named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF radios and modems would have been important and materially relevant to the examiner in deciding whether to allow the claims.

135.   The named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent acted with culpable intent to mislead or deceive the USPTO by withholding known prior art and by making arguments for patentability which could not have been made had the art been disclosed.

136.   In fact, the only prior art that the named inventors disclosed to the USPTO consisted of four references that the European Patent Office brought to the inventors' attention during the

prosecution of their corresponding European patent application.  As stated in their lone Information

Disclosure Statement dated February 3, 1995:  "Such prior art has come to the applicants' attention

by being cited in a Search Report issued October 11, 1994 on the corresponding European

application .…"  The named inventors did not disclose to the USPTO any of the prior art of which

they were  independently aware.

137.    Upon information and belief, the failure by the named CSIRO inventors, as described

above, and/or others substantively involved in the prosecution of the '069 patent to disclose the HF

Radios and Modems and the Percival, Barry, Rault, Le Floch and Bingham papers to the USPTO

examiner during the prosecution of the '069 patent was done with an intent to deceive the USPTO

and constitutes inequitable conduct and a violation of the duty of disclosure, thereby rendering the

'069 patent unenforceable.

### THIRTEENTH AFFIRMATIVE DEFENSE – ADEQUACY OF RELIEF

138.    CSIRO is not entitled to injunctive relief because any alleged injury to CSIRO is not

immediate or irreparable, and because—had CSIRO been injured (which INTEL denies)—it would

have an adequate remedy at law.  In particular, CSIRO does not make, use, sell, offer to sell or

import any product or service that competes with any product made, used, sold, offered for sale, or

imported by Intel.  Thus, CSIRO faces no immediate or irreparable injury as a result of Intel's

ongoing sales of products that allegedly infringe the '069 patent.

### FOURTEENTH AFFIRMATIVE DEFENSE – RESERVATION
### OF ADDITIONAL DEFENSES

139.    Intel reserves the right to assert additional defenses that may be developed through

discovery in this action.

Date: April 9, 2008                         Respectfully submitted,

                                            **POTTER MINTON**
                                            **A Professional Corporation**

                                            By:  */s/ Michael E. Jones*
                                            _____
                                                    Michael E. Jones
                                                    Texas State Bar No. 10929400
                                                    John F. Bufe
                                                    Texas State Bar No. 03316930

                                                    110 N. College Ave.
                                                    Suite 500 Plaza Tower (75702)
                                                    P.O. Box 359
                                                    Tyler, Texas 75710
                                                    Telephone: 903.597.8311
                                                    Fax: 903.593.0846
                                                    Email: mikejones@potterminton.com
                                                            johnbufe@potterminton.com

                                                    ROBERT A. VAN NEST
                                                    RVanNest@kvn.com
                                                    CHRISTA M. ANDERSON
                                                    CAnderson@kvn.com
                                                    RYAN KENT
                                                    RKent@kvn.com
                                                    KEKER & VAN NEST, LLP
                                                    710 Sansome St.
                                                    San Francisco, CA 94111
                                                    Telephone: 415.391.5400
                                                    Fax: 415.397.7188

                                            *Attorneys for Plaintiff*
                                            **INTEL CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 9, 2008. Any other counsel of record will be served by First Class mail on this same date.

                                            */s/ Michael E. Jones*
                                            _____